Adelfo V. MACEREN, Appellee,

v.

DISTRICT DIRECTOR, IMMIGRATION AND NATURALIZATION SERVICE, LOS ANGELES, CALIFORNIA, et al., Appellants.

No. 72–2818.

United States Court of Appeals, Ninth Circuit.

Oct. 25, 1974.

Rehearing Denied Feb. 20, 1975.

---

James R. Dooley, Asst. U. S. Atty. (argued), Los Angeles, Cal., for appellants.

Sidney Broffman (argued), Los Angeles, Cal., for appellee.

Before MOORE,* BROWNING and WALLACE, Circuit Judges.

## OPINION

MOORE, Circuit Judge:

The Immigration and Nationality Act provides that "[t]he number of aliens who may be issued immigrant visas or who may otherwise acquire the status of an alien lawfully admitted to the United States for permanent residence . . . shall not in any fiscal year exceed a total of 170,000." 8 U.S.C. § 1151(a) (1970). In filling this quota, Congress has stipulated that visas must first be granted to those on whom Congress has bestowed a preferred status. This preferred treatment is given to, amongst others,[1]

qualified immigrants who are mem-

---

* The Honorable Leonard P. Moore, United States Senior Circuit Judge for the Second Circuit, sitting by designation.

1. The different classes of preferred immigrants are set forth in 8 U.S.C. § 1153(a).
   (a) Aliens who are subject to the numerical limitations specified in section 1151(a) of this title shall be allotted visas or their conditional entry authorized, as the case may be, as follows:
   (1) Visas shall be first made available, in a number not to exceed 20 per centum of the number specified in section 1151(a)(ii) of this title, to qualified immigrants who are the unmarried sons or daughters of citizens of the United States.
   (2) Visas shall next be made available, in a number not to exceed 20 per centum of the number specified in section 1151(a)(ii) of this title, plus any visas not required for the classes specified in paragraph (1) of this subsection, to qualified immigrants who are the spouses, unmarried sons or unmarried daughters of an alien lawfully admitted for permanent residence.
   (3) Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 1151(a)(ii) of this title, to qualified immigrants who are members of the professions, or who because of their exceptional ability in the sciences or the arts will substantially benefit prospectively the national economy, cultural interests, or welfare of the United States.
   (4) Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 1151(a)(ii) of this title, plus any visas not required

bers of the professions, or who because of their exceptional ability in the sciences or the arts will substantially benefit prospectively the national economy, cultural interests, or welfare of the United States.

8 U.S.C. § 1153(a)(3).

Immigrants who fit this description are given what the Immigration and Naturalization Service refers to as a "third preference," i. e., third most preferential treatment is given to their applications for immigrant visas after the applications of the spouses and unmarried children of United States citizens and the spouses and children of aliens lawfully admitted to the United States for permanent residence. 8 U.S.C. § 1153(b). Every alien who desires immigrant status is presumed to be a "nonpreference immigrant" until he establishes that he is entitled to preferential treatment. 8 U.S.C. § 1153(d). If an alien lays claim to a preference, he must file a petition with the Attorney General requesting this status. The Attorney General will then approve or deny the

petition in which case the Department of State will then either grant or deny the immigration visa. 8 U.S.C. § 1154(a).

If an alien petitions the Attorney General for a "third preference," the Attorney General is required to consult with the Secretary of Labor before making a recommendation to the Department of State. 8 U.S.C. § 1154(b). This consultation is designed to keep the Attorney General abreast of developments in the domestic labor market. A third preference will not be granted to an alien, no matter how qualified a professional he might be, if his employment in this country would likely deprive a U.S. citizen of employment.[2]

Adelfo V. Maceren is a native and citizen of the Philippine Islands, born February 23, 1933. He entered the United States as a visitor on March 30, 1968, and has remained in this country continuously since that date. He holds a Bachelor's Degree in Music and was a music teacher, on the secondary school

---

for the classes specified in paragraphs (1) through (3) of this subsection, to qualified immigrants who are the married sons or the married daughters of citizens of the United States.

(5) Visas shall next be made available, in a number not to exceed 24 per centum of the number specified in section 1151(a)(ii) of this title, plus any visas not required for the classes specified in paragraphs (1) through (4) of this subsection, to qualified immigrants who are the brothers or sisters of citizens of the United States.

(6) Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 1151(a)(ii) of this title, to qualified immigrants who are capable of performing specified skilled or unskilled labor, not of a temporary or seasonal nature, for which a shortage of employable and willing persons exists in the United States.

2. Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor [shall be excluded], unless the Secretary of Labor has determined and certified to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the Unit-

ed States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed. The exclusion of aliens under this paragraph shall apply to special immigrants defined in section 1101(a)(27)(A) of this title (other than the parents, spouses, or children of United States citizens or of aliens lawfully admitted to the United States for permanent residence), to preference immigrant aliens described in sections 1153 (a)(3) and 1153(a)(6) of this title, and to nonpreference immigrant aliens described in section 1153(a)(8) of this title . . . .

8 U.S.C. § 1182(a)(14) (1970).

Although it could, under different circumstances, be argued that a labor certification pursuant to 8 U.S.C. § 1182(a)(14) is not required for one who qualifies as a member of the professions because he practices a profession and does not perform either "skilled or unskilled labor" as specified in the opening portion of that subsection, such an interpretation is unwarranted in light of the fact that the subsection specifically applies itself to professionals seeking third preference status.

level, in his native country. Maceren decided to become a permanent resident of the United States and, in order ultimately to obtain an immigrant visa, petitioned the Attorney General for classification in the third preference as a member of the professions. The petition was supported by an application and documents establishing his professional qualifications as a music teacher. The petition was filed with the Immigration and Naturalization Service on September 27, 1968.

The Service referred the case to the Labor Department which, on November 18, 1969, issued a certification to the Service declaring that Maceren's admission to the United States as an immigrant would not "adversely affect the wages and working conditions of workers in the United States similarly employed." Upon receipt of the labor certification, the Service approved Maceren's petition on November 28, 1969, and granted him the status of a member of the professions along with the third preference which such status entails.

Even though Maceren succeeded in obtaining his classification as a preferred immigrant, such classification did not immediately make him a lawful permanent resident of the United States. He had to wait until an immigrant visa number became available. Because of the backlog of Philippine nationals seeking admission to the United States as third-preference immigrants, no visa number could actually be assigned to Maceren until February 1971. On August 5, 1970, the Immigration and Naturalization Service informed Maceren that a visa number could be assigned him if he filed the proper application and appropriate supporting documents. Maceren followed all instructions and, on September 15, 1970, filed the application which the Service sent him.

The Service immediately acknowledged receipt of the application for permanent residence. Nothing more was done until Maceren received a notice to appear for an interview on February 8, 1971, and for a medical examination on February 17, 1971. Customarily, these are the final steps in granting permanent residence. At the interview, however, Maceren was informed that his petition for a preference had "expired" and permanent residence could not be granted.

On May 25, 1971, Maceren filed a complaint in the District Court praying, *inter alia,* that the court order the State Department to allocate a visa number to him *nunc pro tunc*; that the District Director, Immigration and Naturalization Service, Los Angeles, California, grant his application for adjustment of status to that of a permanent resident; and that the Secretary of Labor and the District Director consider the visa petition and the underlying labor certification revalidated and extended to a date when Maceren's application for adjustment of status is granted.

On September 7, 1971, appellants filed a motion to dismiss and a motion for summary judgment. On May 25, 1972, the District Court filed a Memorandum and Order denying appellants' motions. On May 26, 1972, judgment was entered against appellants and the matter was remanded to them with instructions promptly to take all steps necessary to process Maceren's application for adjustment of status.

The dispute in this case revolves around certain regulations promulgated by the Secretary of Labor and by the Attorney General through which they have attempted to fulfill their responsibilities under the Immigration and Nationality Act.

Until March 30, 1971, the Attorney General applied a rule which required aliens seeking third preferences to renew their *petitions* annually or face denial on the ground that their petitions had lapsed. For aliens requiring individual certificates the one-year period of validity, even though it applied directly to the preference petition, ran not from the date on which the alien received approval of his petition but rather from the

date on which he was issued an individual certificate by the Secretary of Labor.[3]

Throughout this period the Secretary of Labor never limited the validity of an alien's *labor certificate* to any specific time period. In other words, a labor certificate never automatically "expired" at any time after issue.[4] On February 4, 1971, the Secretary of Labor changed his approach and declared that "[l]abor certifications . . . shall be valid for 1 year after the date that the certification was actually made and revalidation shall be required after that period. . . . " 29 C.F.R. § 60.5(b) (1972).[5]

Finally, on March 30, 1971, 8 C.F.R. § 204.4(b) was revised. The revision omitted any mention of a time limit on the approval of an alien's petition to be classified as a preference immigrant. However, it provided that approval of third preference status "shall remain valid for as long as the supporting labor certification is valid and unexpired. . . . " 8 C.F.R. § 204.4(b).[6]

The net effect of these changes, at least in the general case, has been no change at all. The approval, by the Attorney General, of an alien's petition for preferential classification is still valid for a period of one year from the date of certification by the Secretary of Labor just as it was under the old rule. This is not to say, however, that the regulation change has not given rise to many difficulties particularly with respect to those applications that were outstanding when the regulations were revised.

On November 17, 1970, one year after Maceren had been issued a labor certificate, Maceren's preference petition expired under the terms of the Attorney General's regulation. The Immigration and Naturalization Service, however, took no notice of this expiration. On January 26, 1971, the Service summoned

---

3. The approval of a petition to classify an alien as a preference immigrant under section 203(a)(3) or (6) of the Act shall remain valid for a period of 1 year. If the petition is supported by an individual labor certification issued under section 212(a)(14) of the Act, the period of validity shall run from the date the certification was signed by the designated Labor Department official. If the petition at time of approval is supported by a blanket labor certification . . . the period of validity shall run from the date of approval of the petition. 8 C.F.R. § 204.4(b) (1971).

The approval of a petition to classify an alien as a preference immigrant under section 203(a)(3) or (6) of the Act shall remain valid for a period of 1 year from the date of any individual certification issued by the Secretary of Labor pursuant to section 212(a)(14) of the Act; if a blanket certification has been issued covering the alien's profession or occupation, the approval shall remain valid for a period of 1 year from the date of approval. 8 C.F.R. § 204.4 (1968).

4. Certifications issued pursuant to this part are invalid if the repesentations upon which they are based are incorrect. They are applicable only to the positions as described in the Form ES–575–B or as defined in the applicable schedule. 29 C.F.R. § 60.5 (1971).

5. Labor certifications and revalidations of certifications in the categories of employment described below, including any geographic limitations, shall be valid for 1 year after the date that the certification was actually made and revalidation shall be required after that period; this provision shall be applicable to both new and outstanding certifications . . . . 29 C.F.R. § 60.5(b) (1972).

6. Unless revoked pursuant to Part 205 of this chapter, the approval of a petition to classify an alien as a preference immigrant under section 203(a)(3) or (6) of the Act shall remain valid for as long as the supporting labor certification is valid and unexpired, provided in the case of a petition for third preference classification there is no change in the beneficiary's intention to engage in the indicated profession, art or science, and provided in the case of a petition for sixth preference classification there is no change in the respective intentions of the petitioner and the beneficiary will be employed by the petitioner in the capacity indicated in the petition. The approval of a petition to classify an alien under section 203(a)(3) or (6) of the Act which had heretofore become invalid solely because the date until which the approval was valid had lapsed, is hereby reinstated provided the conditions of this paragraph are met. 8 C.F.R. § 204.4(b) (1974).

Maceren to his interview and medical examination.

The expiration of the approval does not decide this case because the March 30, 1971, revision of § 204.4(b) stipulates that:

> The approval of a petition to classify an alien under section 203(a)(3) [third perference status as a professional] . . . which had heretofore become invalid solely because the date until which the approval was valid had lapsed, is hereby reinstated provided the conditions of this paragraph are met.

There has never been any question that Maceren has complied with all legal requirements and would have received an immigrant visa but for the fact that approval of his preferential status expired. Thus, § 204.4(b)'s retroactivity clause would appear to reactivate the approval of Maceren's petition provided the conditions of that regulation are met.

The Service argues that for reactivation to be successful, Maceren's petition must be supported by a valid and unexpired labor certification. Moreover, although there was no time limit on the labor certificate first granted to appellee, labor certificates acquired a one-year term on February 4, 1971, when 29 C.F.R. § 60.5(b) was revised. Thus, according to the Service, Maceren's petition approval cannot be reactivated because it is not presently supported by a valid and unexpired labor certificate, the prime condition for reactivation.

On the other hand, Maceren argues that the new labor regulation which limits the certificate's period of validity does not apply to him because his labor certificate was valid and outstanding without time limitation when § 60.5(b) was revised.

For the reasons set forth below we find in favor of the appellee and affirm the decision of the District Court.

█ Under normal circumstances the regulations promulgated by the Secretary of Labor or his designated officers must be upheld if they are founded on considerations rationally related to the statute he is administering. *Cf.* Boske v. Comingore, 177 U.S. 459, 470, 20 S.Ct. 701, 44 L.Ed. 846 (1900). The one-year period of validity instituted by the revised version of § 60.5(b) is not unreasonable when applied prospectively to new preference petitions in view of the Secretary's duty to advise the Attorney General of the condition of a constantly changing labor market. A one-year time limitation on the labor certificate's validity will often permit the Secretary to re-evaluate the potential contribution of an aspiring immigrant, in the light of ephemeral labor conditions, before permanent resident status is finally granted.

A new and disturbing element is introduced into the calculus, however, when the Secretary attempts to apply such a rule retrospectively to those labor certificates which have been previously granted or reinstated and which continue to support preference petition approvals which are the subject of pending adjudication by the Secretary of State who must grant or deny immigrant status.

In Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 620, 64 S.Ct. 1215, 1222, 88 L.Ed. 1488 (1944), the Supreme Court observed that "law should avoid retroactivity as much as *possible." See also* Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947). In applying this adage the lower courts have sought to balance the possible inequitable results produced by the retroactive application of an administrative rule against the demands of statutory design.

> Which side of this balance preponderates is in each case a question of law, resolvable by reviewing courts with no overriding obligation of deference to the agency decision, NLRB v. Guy F. Atkinson Co., 195 F.2d 141 (9th Cir. 1952); and courts have not infrequently declined to enforce adminis-

trative orders when in their view the inequity of retroactive application has not been counterbalanced by sufficiently significant statutory interests. [Citations omitted.]

Retail, Wholesale and Department Store Union, AFL–CIO v. N.L.R.B., 151 U.S. App.D.C. 209, 466 F.2d 380, 390 (1972).

It is true that the Secretary of Labor has been granted discretionary power to make rules that protect the American economy from job competition and from adverse working standards as a consequence of immigrant workers entering the labor market, 1965 U.S.Code, Congressional and Administrative News pp. 3333, 3334. *Cf.* Cobb v. Murrell, 386 F. 2d 947 (5th Cir. 1967); Braude v. Wirtz, 350 F.2d 702 (9th Cir. 1965). But it is equally clear that the Congressional purpose is not substantially enhanced by requiring 29 C.F.R. § 60.5(b) to apply retroactively to labor certificates previously issued.

On the other hand, the unfair prejudice to the holder of the previously issued labor certificate is manifest, particularly with respect to those aliens seeking recognition of their professional status who had been permitted to enter this country as temporary visitors while their visa applications were pending so that this country might profit from their skills without delay. In some cases, if the applicant was a citizen from a country from which many wished to emigrate, the wait for a visa could take several years. During this time aliens would have been practicing their profession, establishing themselves and their families, marrying, becoming absorbed into the economy, or otherwise planting firm roots. Retroactive application of § 60.5(b) would make deportation a certainty for those, like Maceren, who are unable to obtain revalidation of their certificates due to a change in labor conditions.[7]

Even if we were to hold that the balance between individual hardship and the demands of statutory design tipped in the direction of the appellants, their integrated interpretation of the two relevant regulations, 8 C.F.R. § 204.4(b) and 29 C.F.R. § 60.5(b), demands the invalidation of the retroactive aspects of § 60.5(b).

The Immigration and Naturalization Service argues that the original approval of Maceren's petition, which expired on November 17, 1970, was not reinstated by the retroactivity clause in § 204.-4(b) because reinstatement demands the existence of a current and unexpired labor certificate—something that Maceren did not have as of the effective date of the revision of § 204.4(b) because of the retroactive intervention, on February 4, 1971, of 29 C.F.R. § 60.5(b).

The Service's interpretation of the relationship between 8 C.F.R. § 204.4(b) and 29 C.F.R. § 60.5(b) leads to an incongruous situation. According to its view, § 204.4(b) reinstated all preference petition approvals which had expired prior to March 30, 1971, only if, as of that date, such petitions were supported by a current labor certificate. The *only* way an approval could have expired prior to March 30, 1971 (and thus be a candidate for reinstatement), would be for one year to have elapsed since the issue of its underlying *labor certificate* by the Secretary of Labor. Under 29 C.F.R. § 60.5(b) all individual labor certificates, including those outstanding on March 30, 1971, lapse automatically one year after the day of issue. This means that *no* approval reinstated by the retroactivity provision of § 204.4(b) could ever be supported by an unexpired labor certificate because, under the interpretation urged by the Service, § 60.-5(b) would have terminated all individual labor certificates underlying every petition approval which § 204.4(b) could possibly reinstate.

7. On February 4, 1971, the Department of Labor implemented a restrictive labor certification policy for teachers. *See* Department of Labor Interpreter Releases, Vol. 47, No. 4 (Feb. 4, 1970), No. 7 (Feb. 20, 1970), No. 10 (Mar. 25, 1970). *See also* Guinto v. Rosenberg, 446 F.2d 11 (9th Cir. 1971).

Since the courts should reject interpretations of statutes or regulations which "produce an unjust, unreasonable, or absurd result . . .", In re Petition of Vacontios, 155 F.Supp. 427, 430 (S.D.N.Y.1957), we are forced to disagree with the Immigration and Naturalization Service. Its interpretation of § 60.5(b) would make a nullity of § 204.-4(b)'s retroactivity provision, a provision which succeeded § 60.5(b).

■■ Where the retroactivity provisions of sections 204.4(b) and 60.5(b) appear to be irreconcilable, the earlier regulation should give way to the later in time. We therefore hold that 29 C. F.R. § 60.5(b) cannot be retroactively applied to the labor certifications of aliens whose petitions for preferential status were reinstated by 8 C.F.R. § 204.-4(b).

■ Because we feel that the retroactive application of 29 C.F.R. § 60.5(b) (1972) would cause undue hardship which would not be balanced by a sufficiently significant statutory interest and because retroactive application of 29 C. F.R. § 60.5(b) (1972) would nullify the retroactive aspects of 8 C.F.R. § 204.-4(b) (1974), a subsequent regulation empowered by the same Congressional act, we hold invalid so much of 29 C.F. R. § 60.5(b) (1972) as requires its application to those individual labor certificates granted to petitioners seeking third preferences outstanding prior to its effective date. Consequently, we affirm the District Court in all respects.

WALLACE, Circuit Judge (dissenting):

I respectfully dissent.

The majority affirms the district court's judgment ordering the Immigration and Naturalization Service to grant Maceren permanent resident status primarily because it concludes that the retroactive application of 29 C.F.R. § 60.-5(b) would be incongruous with the retroactive aspects of 8 C.F.R. § 204.4(b). The majority bases its conclusion upon its assumption that the reinstatement provisions of section 204.4(b) would be a nullity if section 60.5(b) were to be applied retroactively. Thus, it holds that we must give retroactive effect only to section 204.4(b), because a court should give effect to the later of two inconsistent regulations.

I disagree that the retroactive application of section 60.5(b) would be inconsistent with the provisions of section 204.4(b) or that the two regulations are irreconcilable. Under the provisions of 8 C.F.R. § 204.4(b), as it read from May 9, 1970, to March 30, 1971, a preference petition under section 203(a)(3) or (6) of the Act that was supported by a labor certification remained valid for one year from the date the labor certification was signed. Until February 4, 1971, the labor certification was valid indefinitely. On February 4, however, the Secretary of Labor revised section 60.5(b), to provide that the labor certification expires after one year unless revalidated. The regulation further provides that "this provision shall be applicable to both new and *outstanding* certifications . . . ." (Emphasis added.)

Subsequent to the issuance of section 60.5(b), on March 30, 1971, the Immigration and Naturalization Service revised section 204.4(b) to provide that a preference petition remains valid as its supporting labor certification is valid, rather than for the one-year period provided previously. The regulation further provides that a preference petition "which had heretofore become invalid solely because the date until which the approval was valid had lapsed, is hereby reinstated provided the conditions of this paragraph are met." One of these conditions is that the preference petition be supported by a valid and unexpired labor certification.

The majority reasons that this savings clause is inconsistent with section 60.5(b), since the preference petition would have expired prior to March 30 only if its supporting labor certification had been signed more than a year prior to that date. If section 60.5(b) is ap-

plied to "outstanding" as well as new certifications, all such supporting certifications would be invalid. Under such a construction, the majority concludes, no preference petition could ever be reinstated under the savings clause.

The majority overlooks the fact, however, that between February 4, the date that the new section 60.5(b) became effective, and March 30, the date the new section 204.4(b) became effective, an immigrant could have revalidated his labor certification. Thus, on March 30 he would have had a valid labor certification but an expired preference petition. The savings clause by its express terms applies to these individuals.

The fact situation in this case demonstrates how the regulation was designed to work. Maceren's preference petition expired on November 17, 1970, but his labor certification remained invalid until February 4, when it terminated automatically under the new regulation. If Maceren had revalidated his labor certification between February 4 and March 30, his preference petition would have been reinstated under the savings clause.

Although this construction of the regulations limits the scope of the savings clause to a short period of time, it gives effect to all of the terms of both regulations. The majority's construction requires the court to give no effect to the language in section 60.5(b) that makes that regulation applicable to "outstanding" labor certifications. Under established rules of construction, we are to give effect to all the words of a statute and to harmonize all the statutes dealing with one subject. Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 633, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L. Ed.2d 859 (1961); United States v. Menasche, 348 U.S. 528, 538–539, 75 S. Ct. 513, 99 L.Ed. 615 (1955); Ruiz v. Morton, 462 F.2d 818, 819–820 (9th Cir. 1972), aff'd, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). The majority needlessly fails to apply this rule.

I would conclude that Maceren was not entitled to permanent resident status because his preference petition had expired and because he failed to revalidate his labor certification. I, therefore, would reverse.